**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | § | **PLAINTIFF** |
| **OPPORTUNITY COMMISSION** | § | |
| | § | |
| **v.** | § | **CIVIL NO.: 1:13cv464-HSO-RHW** |
| | § | |
| **RITE WAY SERVICES, INC.** | § | **DEFENDANT** |

<u>**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT RITE
WAY SERVICES, INC.'S [90] MOTION FOR SUMMARY JUDGMENT,
DENYING AS MOOT PLAINTIFF EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION'S [99] MOTION TO STRIKE DEFENDANT'S EXHIBITS AND
TESTIMONY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT,
DENYING AS MOOT DEFENDANT RITE WAY SERVICES, INC.'S [107]
MOTION TO STRIKE LINDA QUARLES' DECLARATION, AND DENYING
AS MOOT DEFENDANT RITE WAY SERVICES, INC.'S [109] MOTION TO
STRIKE THE DECLARATION OF ANNETTE GEORGE**</u>

BEFORE THE COURT is Defendant Rite Way Services, Inc.'s Motion for

Summary Judgment [90].  Also before the Court are the Motion to Strike

Defendant's Exhibits and Testimony in Support of Motion for Summary Judgment

[99] filed by Plaintiff Equal Employment Opportunity Commission, Defendant Rite

Way Services, Inc.'s Motion to Strike Linda Quarles' Declaration [107], and

Defendant's Motion to Strike the Declaration of Annette George [109].  Having

considered the parties' submissions, the record, and relevant legal authorities, the

Court is of the opinion that Defendant's Motion for Summary Judgment [90] should

be granted.  Plaintiff's Motion to Strike Defendant's Exhibits and Testimony in

Support of Motion for Summary Judgment [99], Defendant's Motion to Strike Linda

Quarles' Declaration [107], and Defendant's Motion to Strike the Declaration of

Annette George [109] should all be denied as moot.  Defendant is entitled to judgment as a matter of law, and this civil action should be dismissed.

## I. BACKGROUND

### A.   Factual Background

Mekeva Tennort ("Tennort") applied for employment with Defendant Rite Way Services, Inc. ("Rite Way") on September 9, 2009.  Tennort Dep. 49:21-25 [90-3].  Tennort was hired and assigned to work a shift from 4:00 p.m. to 8:00 p.m. at Biloxi High School, in Biloxi, Mississippi, cleaning classrooms.  *Id*. at 54:18-55:11, 67:12-17.  In October 2009, Tennort agreed to be reassigned to Biloxi Junior High School ("BJHS") and to work from 6:00 a.m. to 2:30 p.m. Monday through Friday.  *Id*. at 56:17-57:11.  Tennort's new supervisor was Erika Quinn ("Quinn").  *Id*. at 58:3-4.  Tennort's responsibilities expanded to include cleaning the restrooms, the cafeteria, and the hallways and windows.  *Id*. at 57:19-24.

Tennort's daily schedule at BJHS began with cleaning the restrooms, wiping all windows in the hallway, and then moving to the cafeteria to set up for breakfast.  *Id*. at 58:10-24.  Once students finished breakfast, Tennort was responsible for cleaning the cafeteria with two to four of her co-workers.  *Id*. at 59:7-20.  Tennort would then move to her assigned area, the first floor of the main classroom building at BJHS, to clean, sweep, and mop the restrooms, wipe down all hallway windows, and clean the water fountains.  *Id*. at 59:21-60:23.  Tennort was required to return to the cafeteria to set up for lunch and to clean the cafeteria after each wave of students finished lunch.  *Id*. at 61:2-14.  Tennort would then return to her

designated area, check and clean each of the restrooms, and clock out by 2:30 p.m. *Id*. at 61:15-23.

Tennort was not required to work during the summer when classes at BJHS were not in session. *Id*. at 62:9-11. For this reason, Rite Way laid off Tennort effective June 15, 2010,[1] and rehired her effective August 11, 2010, to work at BJHS, again under Quinn's supervision. *Id*. at 62:12-63:4, 66:24-67:11. Tennort had the same job responsibilities during the 2010 to 2011 school year as she had during the 2009 to 2010 school year, and she was similarly laid off at the end of the school year in May 2011. *Id*. at 69:25-70:6, 71:4-72:3. Tennort was rehired by Rite Way effective August 1, 2011, to work in the same capacity at BJHS for the duration of the 2011 to 2012 school year. *Id*. at 74:16-75:10. Upon being hired by Rite Way in September 2009 and rehired in August 2011, Tennort acknowledged receipt of Rite Way's policy for reporting harassment.[2] *Id*. at 54:4-55:5, 78:10-79:15. Rite Way's policy instructed employees to first report incidents to their supervisor and, if not comfortable reporting the incident to their supervisor, to report incidents to Rite Way's Director of Human Resources. *Id*. at 82:2-83:24.

When she began work on August 1, 2011, Tennort was again assigned to Quinn's supervision at BJHS, but Rite Way terminated Quinn's employment on

---

[1] The record reflects that Alexander McCullom ("McCullom"), Rite Way's Project Manager for the City of Biloxi's school system, asked Tennort to work for two weeks during the summer to help move furniture out of classrooms at BJHS. Sworn Statement of Alexander McCullom ¶ 2 [90-8], Tennort Dep. 64:9-65:2 [90-3].

[2] Upon being rehired in August 2010 and August 2011, Tennort also acknowledged receipt of Rite Way's employee handbook, and she did not have any questions about the handbook. Tennort Dep. 66:24-68:12, 76:16-77:5, 79:16-80:18 [90-3].

August 5, 2011.  *Id*. at 75:20-22, 96:1-23; Decl. of Mekeva Tennort ¶ 6 [101-1].[3]  Rite Way replaced Quinn with Willie Dean Harris ("Harris"), who had been working at BJHS as a laundryman since Tennort had returned.  Tennort Dep. 96:24-25, 124:12-15 [90-3].  Tennort also recalled working with Harris when she was assigned to Biloxi High School in 2009.  *Id*. at 98:13-19.  Tennort acknowledged that she did not have "any issues" with Harris during the previous time she worked with him.  *Id*.

In August 2011, Linda Quarles ("Quarles") also began working at BJHS in the same role as Tennort, and Tennort assisted in Quarles' training.  Tennort Decl. ¶ 7 [101-1].  In "[e]arly August," prior to August 11, 2011, Tennort saw Harris act inappropriately towards Quarles.  Tennort Dep. 123:16-124:1 [90-3].  According to Tennort, she observed Harris "act like he was slapping [Quarles'] behind, saying 'ooh wee.'"  *Id*. at 123:22-123:24.  Tennort testified unambiguously that she did not tell Quarles or anyone else about witnessing this gesture:

> Q.   Did you tell Ms. Quarles that you had seen him do that?
> A.   No, ma'am.
> Q.   Did you tell anybody?
> A.   No, ma'am
> Q.   Why not?
> A.   I didn't want to get involved.

*Id*. at 124:5-11.

---

[3] In addition to portions of Tennort's 284 page deposition, the EEOC relies upon a Declaration [101-1] signed by Tennort approximately three weeks after Rite Way filed its Motion for Summary Judgment [90]. The Court has considered the Declaration, but only to the extent that it does not contradict, without explanation, Tennort's extensive deposition testimony. *See Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (noting that a party "may not manufacture a genuine issue of material fact by submitting an affidavit that impeaches prior testimony without explanation"); *Holden v. Illinois Tool Works, Inc.*, No. Civ. A. H-06-3958, 2007 WL 4591752, at *1 (S.D. Tex. Dec. 27, 2007) ("If an affidavit is inconsistent with prior deposition testimony without sufficient explanation, a court has the discretion to disregard the affidavit.") (citing *Doe*, 220 F.3d at 386).

On August 11, 2011, Tennort observed a second incident involving Harris and Quarles.  At approximately 10:00 a.m., Harris approached Tennort and Quarles to, as Tennort understood, warn Quarles about not having a cellular telephone while working.  *Id*. at 115:17-116:15.  According to Tennort, Harris told Quarles that she should not have a cellular telephone on her person, and he instructed Tennort to tell Quarles "to put the phone up out of [Quarles'] back pocket."  *Id*. at 117:24-118:5.  After Tennort mentioned that she too had a cellular telephone on her person but did not have anywhere to put the telephone, Tennort added "[d]ang[, s]omebody must be looking hard because how do you know what's in your back pocket?"  *Id*. at 118:17-119:3, 118:12-16.  Harris responded, "I'm a man. I'm going to look.  They tight, her pants are tight."  *Id*. at 121:6-16.  According to Tennort, Quarles became "real upset," began pulling the slack in the leg of her pants, stated "[i]f anyone else is asking about how tight my jeans are there is going to be some trouble[,]" and walked away indicating that she was going to do something about the incident.  *Id*. at 121:18-122:9, 125:19-126:5.  Tennort did not hear Harris say anything else as Quarles walked away.  *Id*. at 122:24-123:18.  Tennort was not present for any other conversations between Harris and Quarles, and Tennort did not hear Harris make any other comments to or about Quarles or any other female employees.  *Id*. at 125:4-11.

Tennort twice discussed this August 11, 2011, incident with others.  *Id*. at 102:11-103:9, 126:10-127:2.  The first of these discussions took place later that same morning, at approximately 11:00 a.m.  *Id*. at 126:10-127:2.  Quarles directed

Tennort to go to the office of Paul Cannette, Chief of Police for BJHS, to make a statement about the incident. *Id.*; Decl. of Paul Cannette ¶ 3 [101-11]. When Tennort arrived at Officer Cannette's office, he asked her about the incident between Harris and Quarles. Tennort Dep. 17-20 [90-3]. Tennort told Officer Cannette "about how [Harris] was making gestures to [Quarles'] behind, and how he was a man, he's going to look, and how upset [Quarles] got." *Id.* at 127:19-24. This was the only occasion that Tennort spoke to Officer Cannette about the August 11, 2011, incident. *Id.* at 128:5-7.

On August 18, 2011, McCullom traveled to BJHS to obtain a statement from Tennort about the August 11, 2011, incident. Sworn Statement of Alexander McCullom ("McCullom Statement") ¶¶ 2, 5 [90-8]. McCullom approached Tennort, indicated that he wanted to see her regarding the August 11, 2011, incident, and asked her to come to the cafeteria. Tennort Dep. 103:7-104:4 [90-3]. According to Tennort, before she began writing her statement, McCullom tried to tell her not to write a statement by telling her "you know what they do to people who do stuff like this." *Id.* at 105:7-10, 109:2-3. When Tennort made it clear that she was going to write her statement, McCullom got up from the table at which the pair were sitting and left the cafeteria to allow her to write her statement. *Id.* at 110:18-111:3. Tennort acknowledged that McCullom's comment did not prevent her from writing the statement, did not intimidate her such that she would not write the statement, and that there was nothing about the statement that she wanted to change or amend. *Id.* at 257:14-258:4, 280:15-25. Tennort provided the following:

Biloxi                                                  18 Aug 11

On Thursday August 11 of 2011, I, Mekeva Tennort, witnessed an [*sic*] situation at Biloxi Jr. High School while on break. I do not like being in turmoil but yet I was in a situation where I had no choice but to tell the truth. While on break of 11 Aug around 10:30am Ms [*sic*] Linda and I were finishing our break and Mr. Willie ended his phone call on his cell phone to tell Ms. Linda about her cell phone in her back pocket. Mr. Willie said Mr. Al said he seen her phone in her back pocket and its [*sic*] not allowed. He said he was trying to help her because Mr. Al was trying to get rid of her anyway so she said I also had my phone in my pocket also then I stated well I do not have a vehicle at the moment to put mine in then she told me I could put my phone in her truck so I would not get in to [*sic*] any trouble. So I did so. I told her to pull her shirt as if she was stretching it so wouldn't [*sic*] anyone be looking at her back pocket. Then I also said "DANG" [*sic*] somebody must be looking real hard at her behind to know whats [*sic*] in her back pocket because that could be anything. And Mr. Willie said you could tell it was a cell phone. He said her pants are tight. Then Ms. Linda said her pants wasn't [*sic*] tight to where she pulled them showing the slack in them. And she said don't worry about how tight my pants are. Then Mr. Willie said I'm a man I'm gonna [*sic*] look. Then Ms Linda said the next person who comments on that while slapping her hands its gonna [*sic*] be trouble. So while I'm working in the cafeteria I was called out while the cafeteria was full of kids to make a statement the same statement Im [*sic*] now writing. I came to work for Rite Way to do my work and earn my $ [*sic*] and go home. I don't want any trouble just whats rite [*sic*].

Mekeva Tennort

*Id.* at 102:11-103:9; Pl.'s Ex. 2 [101-12].

On August 20, 2011, the day after Tennort provided her written statement to Rite Way, Mr. Thomas Walker ("Walker") replaced Harris as supervisor of Quarles and Tennort.[4]  McCullom Statement ¶ 7  [90-8].  Tennort recalled that Walker was

---

[4] Although Harris was removed from his role as a supervisor at BJHS, the record reveals that Tennort recalled seeing Harris delivering supplies to BJHS, but she did not have any conversations with him. Tennort Dep. 124:12-125:3 [90-3]. While the EEOC submitted a Declaration signed by Quarles and which identified further interaction between Quarles and Harris after Harris' removal as supervisor but while he allegedly delivered supplies for Rite Way to BJHS, Tennort did

very hard on her, followed her around while she carried out her job duties, used expletives to describe her work, and often levied criticisms of Tennort's work performance.  Tennort Dep. 130:21-131:3, 137:19-138:22; 141:4-143:5 [90-3].  Walker changed Tennort's job duties from day to day such that she did not know what to expect from Walker, and he made her start cleaning areas of BJHS that she had not ever been responsible for cleaning.  *Id*. at 134:19-136:18.  Walker also made Tennort mix various cleaning chemicals on several occasions, a practice Tennort believed was contrary to Rite Way policy.  *Id*. at 145:1-150:6.  While the record reflects a number of disputes between Tennort and Rite Way about the validity of write-ups Rite Way claims were issued to Tennort based on her allegedly poor work performance, the parties do not dispute that Tennort's employment was terminated effective September 26, 2011.  *See* Walker Dep. 164:16-165:8 [90-2].

Tennort subsequently applied for unemployment benefits with the Mississippi Department of Employment Security ("MDES").  Tennort Dep. 198:21-199:8 [90-3].  According to Rhonda Seigel, a Rite Way corporate representative, Tennort's application for unemployment benefits was initially denied after a November 30, 2011, hearing at which McCullom participated and explained Rite Way's position as to why Rite Way terminated Tennort's employment.  Seigel Dep. 155:23-156:17 [101-4]; Tr. of Recorded Telephonic Hearing – Unemployment Insurance Appeal 3, 7, 19 [101-9].  Tennort appealed the MDES decision and was ultimately awarded unemployment benefits.  Tennort Dep. 199:5-8 [90-3].

---

not speak with Harris or hear Harris make any comments about Quarles or any other female employee after the August 11, 2011, incident. Decl. of Linda Quarles ¶¶ 17, 20 [101-10]; Tennort Dep. 125:2-14; 151:8-14 [90-3].

B.     Procedural Background

Tennort filed a charge of discrimination with the EEOC on November 9,

2011.  Charge of Discrimination [90-28].  Tennort claimed that she had been

retaliated against after providing the written statement to McCullom.  *Id*.  After

conducting an investigation, the EEOC filed the Complaint on June 27, 2013,

advancing a retaliation claim under Title VII, 42 U.S.C. §§ 2000e-1 to -2000e-17,

predicated upon "an increasingly severe campaign of retaliatory actions against

Tennort" immediately subsequent to Tennort having reported the incident between

Quarles and Harris to Cannette and providing the written statement to McCullom.

Compl. ¶¶ 7, 23-25.

Rite Way now moves for summary judgment as to the EEOC's retaliation

claim on the basis that the EEOC cannot establish two of three elements of a prima

facie claim of retaliation.  Mem. Br. in Supp. of Mot. for Summ. J. 10-17 [91].

According to Rite Way, the EEOC cannot demonstrate that Tennort engaged in

protected activity or that Tennort's providing a statement to Rite Way about the

incident between Quarles and Harris constituted a "but for" cause of Rite Way's

decision to terminate Tennort's employment.  *Id*.  Rite Way contends that even if

the EEOC were to establish a prima facie case of retaliation, it cannot demonstrate

that Rite Way's nonretaliatory reasons for terminating Tennort's employment were

pretext.  *Id*. at 18.  In addition, Rite Way asserts that to the extent the EEOC relies

upon Rite Way having provided information to the MDES regarding the reasons for

Tennort's discharge as a basis for the retaliation claim, Tennort failed to exhaust

9

her administrative remedies with respect to Rite Way's reporting to MDES. As a result, Rite Way claims it is entitled to judgment as a matter of law to the extent the retaliation claim is predicated on any reporting to MDES. *Id.* at 19-22.

During briefing of Rite Way's Motion for Summary Judgment [90], the parties filed three Motions raising evidentiary issues. The EEOC filed a Motion to Strike Defendant's Exhibits and Testimony in Support of Defendant's Motion for Summary Judgment [99], which sought exclusion of a report summarizing Tennort's alleged tardiness and various statements contained in the declarations submitted by Rite Way in support of its nonretaliatory reasons for terminating Tennort. Rite Way filed a Motion to Strike Linda Quarles' Declaration [107] claiming Quarles' Declaration was impermissibly based upon Quarles' "information and belief," hearsay statements, and speculative allegations. Rite Way also filed a Motion to Strike the Declaration of Annette George ("George") [109], an EEOC investigator who participated in the investigation of Tennort's charge, contending that the EEOC submitted the Declaration notwithstanding that fact that the EEOC asserted the deliberative process privilege and refused to produce information pertaining to George's investigation.

## II. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To rebut a properly supported motion for

summary judgment, the opposing party must show, with "significant probative evidence," that there exists a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). "'If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate." *Cutting Underwater Technologies USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In considering a motion for summary judgment, the Court "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Total E&P USA Inc. v. Kerr-McGee Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (citations omitted).

"There is no material fact issue unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 858 (5th Cir. 2010). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law[, and an] issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton*, 232 F.3d at 477 (citing *Anderson*, 477 U.S. at 248). "[M]ere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment." *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "The court has no duty to search the record for material fact issues." *RSR Corp.*, 612 F.3d at 858. "Rather, the party opposing summary judgment is required to identify

specific evidence in the record and to articulate precisely how this evidence supports his claim." *Id.*

B.    Analysis

    1.    Prima Facie Claim of Retaliation

When based on circumstantial evidence,[5] analysis of a retaliation claim under Title VII is guided by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Baker v. Am. Airlines, Inc.*, 430 F.3d 750, 754 (5th Cir. 2005) (citation omitted). To establish a prima facie case of retaliation, Plaintiff must show "1) that [she] engaged in a protected activity; 2) that an adverse employment action occurred; and 3) that a causal link existed between the protected activity and the adverse action." *Septimus v. Univ. of Houston*, 399 F.3d 601, 610 (5th Cir. 2005) (citations omitted). If the employee makes a prima facie showing, the burden shifts to the employer to produce a legitimate, nonretaliatory reason for the adverse employment action. *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 805 (5th Cir. 2007). Once the employer meets its burden of production, the burden then shifts back to the employee "to demonstrate that the employer's reason is actually a pretext for retaliation . . . , which the employee accomplishes by showing that the adverse action would not have occurred 'but for' the employer's retaliatory motive . . . ." *Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (citing

---

[5] The parties do not appear to dispute that the EEOC relies only upon circumstantial evidence of retaliation. *Compare* Mem. Br. in Supp. of Mot. for Summ. J. 9-10 [91] *with* Br. in Supp. of Opp'n to Mot. for Summ. J. 13 [103].

*LeMaire v. Louisiana*, 480 F.3d 383, 388-89 (5th Cir. 2007) and *Univ. of Texas Sw. Med. Ctr v. Nassar*, 133 S. Ct. 2517, 2533 (2013)) (internal marks omitted).

2. <u>The EEOC Has Not Demonstrated that Tennort Engaged in Protected Activity</u>

Rite Way contends that the EEOC cannot establish a prima facie case of retaliation because Tennort never engaged in protected activity.  Mem. Br. in Supp. of Mot. for Summ. J. 10-15 [91].  "An employee has engaged in activity protected by Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII."  *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996) (quoting 42 U.S.C. § 2000e–3(a)). These clauses are known respectively as the "opposition clause" and the "participation clause."  *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000).  Rite Way claims that the EEOC cannot establish protected activity under either clause.  Mem. Br. in Supp. of Mot. for Summ. J. 10-15 [91].

a. <u>Participation Clause</u>

Rite Way asserts that Tennort's activity at most amounted to participation in Rite Way's internal investigation into the comment made by Harris regarding why he looked at Quarles' pants.  *Id.* at 10-12.  According to Rite Way, "an employee's participation in an internal investigation which is not conducted in connection with the filing of an EEOC Charge does not constitute protected activity under Title VII's participation clause."  *Id.* at 10.  The EEOC points out that "[t]he antiretaliation provision [of Title VII] explicitly states that it protects an individual who has

13

'participated in any manner' in a Title VII proceeding[,]" and reasons that this language should be read expansively to include within its protection employees who "report discriminatory employment practices or assist in the investigation of these practices." Br. in Supp. of Opp'n to Mot. for Summ. J. 22 [103]. Without citation to binding legal authority, the EEOC advocates that filing a formal charge or institution of proceedings under Title VII should not be required in order to trigger the protections of the anti-retaliation provision. *Id.* at 23-24.

The United States Court of Appeals for the Fifth Circuit has found that "the 'participation clause' is irrelevant" where the employee raising a Title VII retaliation claim "did not file a charge with the EEOC until after the alleged retaliatory discharge took place." *Byers*, 209 F.3d at 428. It is undisputed that at the time of Tennort's discharge on September 26, 2011, neither she nor Quarles had filed a charge with the EEOC or otherwise instituted proceedings related to the alleged retaliation. Charge of Discrimination [90-28] [90-29]. Accordingly, as a matter of law, the EEOC cannot rely upon the "participation clause" to demonstrate that Tennort engaged in protected activity. *Ellis v. Compass Grp. USA, Inc.*, 426 F. App'x 292, 297 (5th Cir. 2011) (finding employee could not "satisfy the participation clause because, at the time of her suspension, she was not making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under title VII[,] . . . [and] there was no title VII proceeding at the time of the activity that led to her suspension—even the alleged retaliation occurred before the filing of an EEOC charge") (citing *Byers*, 209 F.3d at 428).

14

b.    Opposition Clause

Rite Way posits that the EEOC also cannot establish that Tennort "opposed an employment practice [or] that Tennort had an 'objectively reasonable belief' that the opposed employment practice was barred by Title VII."  Mem. Br. in Supp. of Mot. for Summ. J. 12 [91].  According to Rite Way, merely expressing opposition to a single comment by a co-worker does not constitute opposition to an unlawful employment practice.  *Id.* at 13.  Rite Way maintains that a single comment made sporadically or in a casual conversation cannot give rise to an objectively reasonable belief that the comment amounted to an unlawful employment practice under Title VII.  *Id.* at 14-15.

Relying heavily upon the Supreme Court's decision in *Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee*, the EEOC counters that the "opposition clause" protects an employee such as Tennort who answers her employer's questions during the employer's internal investigation.  Br. in Supp. of Opp'n to Mot. for Summ. J. 15-17 [103] (citing 555 U.S. 271, 273, 277-80 (2009)).  The EEOC maintains that "Tennort opposed an unlawful employment practice by Harris" on two occasions, first when she informed Officer Cannette about the incident between Harris and Quarles, and second when she provided a written statement to McCullom regarding "Harris'[] unlawful behavior."  *Id.* at 17-18.  With respect to whether Tennort possessed a reasonable belief that Harris' alleged behavior towards Quarles was an unlawful employment practice, the EEOC makes the conclusory assertion without citation to the record that "Tennort held a

good faith, reasonable belief that Harris'[] unlawful sexual harassment was an unlawful employment practice." *Id.* at 20.  The EEOC further argues that imposing a requirement that Tennort have a "reasonable belief" that the August 11, 2011, incident amounted to an unlawful employment practice contradicts the *Crawford* decision. *Id.* at 21-22.

As a threshold matter, the Court is unpersuaded by the EEOC's argument that requiring Tennort to have a "reasonable belief" that the August 11, 2011, incident amounted to an unlawful employment practice contradicts *Crawford. See Satterwhite v. City of Houston*, No. 14-20240, 2015 WL 877655, at *2 (5th Cir. Mar. 3, 2015) (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 349 (5th Cir. 2007)). *Satterwhite* involved a Title VII retaliation claim based upon Courtney Satterwhite's having witnessed allegedly discriminatory conduct by Harry Singh. *Id.* at *1.  While Satterwhite, Singh, and other employees were at a meeting, Singh allegedly used the phrase "Heil Hitler" to describe a situation. *Id.* Another employee present at the meeting, Daniel Schein, was offended by Singh's use of the phrase. *Id.* Satterwhite claimed to have engaged in protected activity under the "opposition clause" by reporting the incident to the company's Deputy Director of Human Resources, and by responding to questions in connection with the employer's investigation of the incident. *Id.* The Court of Appeals noted that while under *Crawford* Satterwhite's oral report and subsequent responses to the employer's investigation could have qualified as "opposing under 42 U.S.C. § 2000e-3(a), for his actions to be protected activities Satterwhite must also have had a

16

reasonable belief that Singh's comment created a hostile work environment under Title VII." *Id.* at *2 (footnotes omitted).  The Fifth Circuit looked at the totality of the circumstances and found that "[n]o reasonable person would believe that the single 'Heil Hitler' incident is actionable under Title VII."  *Id.* at *2-3.  In reaching its decision, the Fifth Circuit also pointed out that "isolated incidents (unless extremely serious) do not amount to actionable conduct under Title VII[,]" and that "numerous Title VII claims based on isolated incidents of non-extreme conduct" have been rejected "as insufficient as a matter of law."  *Id.* at *2 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)) (internal marks omitted).

Here, the EEOC contends that "Tennort opposed an unlawful employment practice by Harris" when she reported on the August 11, 2011, incident involving Quarles and Harris.  Br. in Supp. of Opp'n to Mot. for Summ. J. 17 [103].  *Satterwhite* and the cases cited therein instruct that evaluating whether Tennort's reports amount to protected activity under Title VII's opposition clause requires the Court to determine whether a reasonable person would believe that Harris' conduct was actionable under Title VII.  *See, e.g.*, *Satterwhite*, 2015 WL 877655, at *2 n.12 (citing *Turner*, 476 F.3d at 349).  In making this determination, the Court may look to prior cases in which incidents have been reported.  *See id.* at *2-3 (rejecting retaliation claim by looking to prior case in which retaliation claim failed as a matter of law because employee could not have reasonably believed that isolated comments he reported amounted to an unlawful employment practice).

17

"An action for sexual harassment in violation of Title VII requires the plaintiff to demonstrate 'that the harassment created a hostile or abusive working environment.'" *Paul v. Northrop Grumman Ship Sys.*, 309 F. App'x 825, 827 (5th Cir. 2009) (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005)).  Stated differently, "sexual harassment is actionable under Title VII only if it is 'so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Clark Co. School Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (quoting *Faragher*, 524 U.S. at 786) (internal marks omitted).  Courts do not measure the conduct at issue in isolation.  *Id.* "[I]nstead, 'whether an environment is sufficiently hostile or abusive' must be judged 'by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 270-71.

Looking at the totality of the circumstances here, Tennort reported a single, isolated incident of alleged sexual harassment that occurred once over the span of approximately three weeks.  Tennort Dep. 123:19-124:11; 112:22-114:24 [90-3].  That incident occurred on August 11, 2011, when Tennort suggested that Harris "must be looking real hard at [Quarles'] behind to know what's in [her] back pocket[,]" to which Harris responded "I'm a man, I am going to look."  *Id.* at 113:16-114:16, 121:6-16.  Although the record reveals that Harris' comment upset and angered Quarles, there is insufficient evidence that this isolated incident can be

viewed as having unreasonably interfered with the work performance of Quarles or Tennort.  *See* Decl. of Linda Quarles [101-10]; Tennort Dep. 260:1-13 [90-3].

"[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  *Faragher*, 524 U.S. at 788 (citation and internal marks omitted).  Moreover, "the mere utterance of an . . . epithet which engenders offensive feelings in an employee is insufficient, without more, to support Title VII liability."  *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996) (citations and internal marks omitted).  Even incidents which are "wholly inappropriate" will not survive summary judgment where those incidents "do not evidence sufficiently pervasive hostility toward [the employee] as a matter of law . . . ."  *Hague v. Univ. of Texas Health Sci. Ctr. at San Antonio*, 560 F. App'x 328, 332 (5th Cir. 2014).

While Harris' comment was "wholly inappropriate," the record does not support a finding that this isolated incident rises to the level of "pervasive or severe[]" sufficient to amount to a cognizable Title VII violation.  *See, e.g.*, *Barnett v. Boeing Co.*, 306 F. App'x 875, 876, 879 (5th Cir. 2009) (affirming summary judgment against employee on hostile work environment claim predicated on sexual harassment spanning eight months and consisting of manager's "leering, sexually suggestive comments, and unwanted touching" in the form of patting employee on her upper thigh as he walked by her because such conduct did not rise to the level of being severe or pervasive) (citing *Hockman v. Westward Communications, LLC*, 407

F.3d 317, 326 (5th Cir. 2004)); *Gibson v. Potter*, 264 F. App'x 397, 401 (5th Cir. 2008) (affirming summary judgment as to plaintiff's hostile work environment claim predicated on sexual harassment based on her supervisor "grabbing her on the buttocks and [making] suggestive comments," and noting that plaintiff's additional allegations that supervisor engaged in "sex talk," asked her out, and offered his telephone number prior to the nonconsensual touching were not only unsubstantiated but also did "not rise to the level of severity or pervasiveness required by the law") (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 872-74 (5th Cir. 1999)).

Even if the Court were to consider the prior incident which occurred at an unspecified time between August 1, 2011, and August 11, 2011, and involving Harris' alleged "ooh wee" comment and slapping his hands, the two incidents simply do not rise to the level of being "so severe or pervasive as to alter the conditions of . . . employment and create an abusive working environment." *Breeden*, 532 U.S. at 270 (quoting *Faragher*, 524 U.S. at 786) (internal marks omitted); *see, e.g., Hague*, 560 F. App'x at 332 (affirming summary judgment as to employee's sexual harassment claim where employee identified two incidents of sexually harassing conduct within a one month timespan, a colleague's reading of an explicit magazine article aloud in her presence and his giving another co-worker a sexually explicit doll, because although wholly inappropriate, the incidents were not sufficiently pervasive); *Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 330 (5th Cir. 2009) (affirming summary judgment on claim for hostile work environment based

on sexual harassment where supervisor, over a span of one month, made six sexual advances to employee and told her that the pair needed to be "sweet to each other[,]" which conduct the court noted amounted "to one subjectively offensive utterance by [the supervisor] every few days" but did not create a sexually hostile work environment as a matter of law because this conduct [was] "not severe, physically threatening, or humiliating[ and was] . . . not the kind of conduct that would interfere unreasonably with a reasonable person's work performance or destroy her opportunity to succeed in the workplace").  Consequently, the EEOC cannot establish a prima facie case of retaliation because it cannot demonstrate that Tennort engaged in protected activity under Title VII's opposition clause.  Rite Way is entitled to summary judgment as to the EEOC's retaliation claim.

### 3.   The EEOC's Alternative Argument Grounded Upon Rite Way's Providing Information to the MDES Regarding Tennort's Termination

To the extent that the EEOC grounds its retaliation claim upon Rite Way's providing information to MDES during Tennort's attempt to obtain unemployment benefits, Rite Way contends that Tennort's claim for unemployment benefits and subsequent denial of that claim constituted a discrete act of retaliation which must be made the subject of an EEOC charge.  Mem. Br. in Supp. of Mot. for Summ. J. 19 [91].  Because Tennort's EEOC Charge does not include a claim of a denial of unemployment benefits and the EEOC did not include such an allegation in its administrative investigation, Rite Way reasons that Tennort failed to exhaust her administrative remedies with respect to this claim.  *Id.* at 19-20.  Rite Way further contends that the "legitimate, non-discriminatory, non-pretextual reason" for

21

providing information to the MDES is that Rite Way is under a legal duty to provide such information to the MDES and complying with that duty did not constitute an adverse employment action.  *Id.* at 20-22.  Rite Way maintains that the EEOC cannot establish a causal link between Tennort's alleged protected activity and Rite Way's reporting information to the MDES because the Rite Way employee who provided the information had no knowledge of "Rite Way soliciting a statement from Tennort."  *Id.* at 21.

The EEOC appears to disclaim any attempt to rely upon Rite Way's reporting to the MDES regarding the reasons it terminated Tennort as a separate ground for its retaliation claim.  Br. in Supp. of Opp'n to Mot. for Summ. J. 25 [103].  At the same time, however, the EEOC asserts that "Rite Way further retaliated against Tennort when it falsely reported to MDES that she was terminated due to performance issues."  *Id.*  Because the EEOC makes no effort to respond to Rite Way's properly supported summary judgment argument regarding Tennort's failure to exhaust the administrative remedies available to her with regard to Rite Way's reporting to the MDES, Rite Way is entitled to judgment as a matter of law as to the retaliation claim on this ground.

> 4. <u>The Parties' Evidentiary Motions</u>

As noted *supra* at page 8, the record contains extensive dispute related to the validity of the performance-based reasons Rite Way cites as justifying its decision to terminate Tennort's employment.  Each of the three Motions [99] [107] [109] filed by the EEOC and Rite Way attack evidence underlying this dispute.  Namely, the

EEOC seeks exclusion of records related to Tennort's attendance and complaints allegedly made by BJHS employees about the condition of areas of the school within Tennort's responsibility.  Mem. in Supp. of Mot. to Strike 1-5 [99].  Rite Way requests that the Court strike George's Declaration which purports to establish that McCullom made the decision to terminate Tennort's employment and portions of Quarles' Declaration which describe the alleged effect that Walker had upon Tennort after he became her supervisor.  *See* Mem. in Supp. of Mot. to Strike Decl. of Linda Quarles 1-6 [108]; Mem. in Supp. of Mot. to Strike Decl. of Annette George 1-8 [110].  Because the Court finds that Tennort did not engage in protected activity and thus cannot establish a prima facie case as a matter of law, the Court need not address these evidentiary motions related to the cause of Tennort's termination. *Greene v. DaimlerChrysler Servs. of N. Am.*, 128 F. App'x 353, 357 (5th Cir. 2005) (noting that employee's failure to establish second element of a prima facie claim for retaliation precluded that claim).  The Motions to Strike [99] [107] [109] are therefore moot.

## III. CONCLUSION

Having considered the Motion for Summary Judgment [90] filed by Defendant Rite Way Services, Inc., the Court, after a full review and consideration of the Motion [90], Plaintiff Equal Employment Opportunity Commission's Response [101], the parties' additional submissions, the record, and relevant legal authorities, finds that in accord with the reasons more fully stated above,

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that Defendant Rite Way Services, Inc.'s Motion for Summary Judgment is **GRANTED** and judgment is rendered in favor of Defendant pursuant to Federal Rule Civil Procedure 56.  This civil action is **DISMISSED WITH PREJUDICE**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that Plaintiff Equal Employment Opportunity Commission's Motion to Strike Defendant's Exhibits and Testimony in Support of Defendant's Motion for Summary Judgment [99] is **DENIED** as **MOOT**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that Defendant Rite Way Services, Inc.'s Motion to Strike Linda Quarles' Declaration [107] is **DENIED** as **MOOT**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that Defendant Rite Way Services, Inc.'s Motion to Strike the Declaration of Annette George [109] is **DENIED** as **MOOT**.

**SO ORDERED AND ADJUDGED**, this the 31st day of March, 2015.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE